# United States Court of Appeals
## For the First Circuit

No. 11-2242

UNITED STATES OF AMERICA,

Appellee,

v.

JULIO ROSARIO-OTERO, a/k/a Hotdog,

Defendant, Appellant.


APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. José Antonio Fusté,  U.S. District Judge]


Before

Howard, Selya and Thompson,
Circuit Judges.


Raymond L. Sanchez Maceira for appellant.
Olga B. Castellón-Miranda, Assistant United States Attorney with whom Rosa Emilia Rodriguez-Velez, United States Attorney, Nelson Pérez-Sosa, Assistant United States Attorney and Julia M. Meconiates, Assistant United States Attorney, were on brief, for appellee.


September 4, 2013

**HOWARD, Circuit Judge**.  Julio Rosario-Otero appeals the sentence imposed after his conviction for possession with intent to distribute illegal narcotics.  He claims that the sentencing court should have granted a continuance to allow him to marshal necessary evidence.  He also argues that the sentencing court's individualized finding as to the amount of drugs that he could have reasonably foreseen was erroneous.  Neither argument persuades us.  We will, however, vacate Rosario-Otero's sentence as to the term of supervised release sua sponte and remand for the limited purpose of recalculating that term.

**I.**

This case is before us for the second time.  See United States v. Fernández-Hernández, 652 F.3d 56 (1st Cir. 2011).  As the underlying facts of Rosario-Otero's conviction are recounted in our previous opinion, we limit ourselves to the facts relevant to this appeal.

1.      Prior History

Rosario-Otero was a member of the "Los Dementes" drug trafficking organization operating in the municipalities of Cataño and Guaynabo in Puerto Rico.  The government charged him and other members of the organization with various conspiracy and drug counts.  A jury convicted Rosario-Otero of conspiracy to possess with intent to distribute, see 21 U.S.C. § 846, and possession with intent to distribute both cocaine and crack cocaine, see id. §

841(a)(1).  The jury made specific drug quantity findings for the possession offenses: at least 150 grams of crack cocaine and at least 5 kilograms of cocaine.  The district court, based on the jury's finding as to drug quantity, sentenced him to 151 months' incarceration and 10 years' supervised release.  Rosario-Otero challenged his convictions in a Rule 29 motion, which the district court denied.

On appeal, we upheld Rosario-Otero's convictions both for participating in the drug conspiracy and for the substantive possession offenses.  We also concluded, however, "that the evidence was insufficient to support a finding, beyond a reasonable doubt, that Rosario was responsible for the elevated drug quantities of which he was convicted, i.e., at least one hundred fifty grams of crack-cocaine and five kilograms of cocaine." Fernández-Hernández, 652 F.3d at 70.  Consequently, we vacated Rosario-Otero's sentence and remanded for resentencing.  In doing so, we "express[ed] no view as to the [drug] quantities the sentencing court may properly attribute to Rosario when the standard, unlike the standard for conviction, is preponderance of the evidence."  Id. at 71 n.14.

2.    Resentencing

We issued our decision in Fernández-Hernández on June 30, 2011.  On August 25, Rosario-Otero requested that the district court reschedule his resentencing hearing.  He also requested a

transfer from the mainland United States to Puerto Rico. The court granted both requests, setting the hearing for October 5, 2011. Rosario-Otero arrived in Puerto Rico one week before the hearing. However, due to scheduling conflicts, he did not meet with his counsel until the night before the resentencing hearing.

At the hearing the following day, Rosario-Otero, through his counsel, requested a continuance. This oral request was not accompanied by any written request, nor had Rosario-Otero previously discussed a continuance with the government. Nonetheless, Rosario-Otero's counsel argued that a continuance was necessary because Rosario-Otero's recent arrival in Puerto Rico had not given him enough time to prepare for the resentencing. In particular, counsel expressed a need to call Juan Rivera-Gómez, a co-defendant at trial, to testify. When the district court asked where Rivera-Gómez was, Rosario-Otero's counsel responded, "He's in Miami, I believe." The district court denied this continuance, concluding that, notwithstanding Rosario-Otero's delayed arrival in Puerto Rico, he had ample time to prepare for the resentencing, including calling any witnesses.

The government then presented evidence regarding the amount of drugs that would have been foreseeable to Rosario-Otero based on his involvement in the trafficking organization. William Rosario García ("William"), one of the trial witnesses, testified at the resentencing hearing that the Los Dementes organization

-4-

processed roughly one kilogram of cocaine into crack cocaine each week at "Apartment 50," located at the Juana Matos housing project. William also testified that he saw Rosario-Otero go into this apartment several times a week, often to pick up packaged drugs.

William testified that Rosario-Otero owned a specific drug point in Cataño. He learned this information from the drug sellers who worked at that drug point. Moreover, on one occasion William washed Rosario-Otero's car and in return Rosario-Otero gave him crack cocaine in vials with gray caps. According to William, this matched the color of the drug vials distributed at this particular drug point. At the time, Rosario-Otero told William that these vials came from his drug point, but did not specify which drug point he owned.

Finally, William stated that he saw Rosario-Otero handle drugs on two additional occasions. In both instances, Rosario-Otero asked William to process cocaine into crack cocaine and taste it for him. One of these encounters occurred at the Coqui Housing Project across the street from the Juana Matos Housing Project. William did not specify the location of the second encounter. He also admitted that he had failed to mention this second encounter during his trial testimony.

On cross-examination, Rosario-Otero sought to demonstrate inconsistencies between William's trial testimony and his testimony at resentencing. In particular, he noted how William's testimony

had become more specific in a number of respects since trial. William had been unsure about the various colors of drug caps at trial, yet exhibited no such hesitancy at resentencing. Moreover, at trial he had testified to having seen Rosario-Otero at Apartment 50 at least two times, yet at resentencing he revised that estimate to "[s]everal times a week."

William was the only witness at the resentencing hearing. At the conclusion of his testimony, Rosario-Otero asked to call Agent Cristobal Rodriguez. Agent Rodriguez had previously interviewed William during the investigation of the Los Dementes organization, and Rosario-Otero hoped that Agent Rodriguez could show how William's testimony had changed over time. However, Rosario-Otero had not subpoenaed Agent Rodriguez and the district court refused to continue the proceedings in order to bring him in. Rosario-Otero's counsel argued that the shifting substance of William's testimony raised an unforeseen necessity, but the court determined that William's testimony contained "the same or musical variations of the same" testimony that he had offered at trial. The district court further found William's testimony credible.

The court, making "a conservative measure" of the amount of cocaine attributable to Rosario-Otero, concluded that Rosario-Otero could have foreseen the possession and distribution of 5 to 15 kilograms of cocaine, and imposed a sentence of 151

months' incarceration and 10 years' supervised release, which matched the original sentence.  This appeal followed.

## II.

Rosario-Otero asks us to vacate his sentence and remand the case to a different district court judge on the grounds that the district court (1) abused its discretion in failing to grant the request for a continuance that he presented at the beginning of the resentencing hearing; and (2) erred in its drug quantity determination.

A.        Denial of Continuance

We review the district court's denial of a continuance for abuse of discretion.  United States v. Fink, 499 F.3d 81, 89 (1st Cir. 2007).  When evaluating a request to continue, one consideration is "the reasons contemporaneously presented in support of the request for the continuance."  West v. United States, 631 F.3d 563, 568 (1st Cir. 2011) (citation omitted) (internal quotation marks omitted).  A court also considers the amount of time needed for preparation compared to the actual time available; how diligently the movant used that time and whether he contributed to his perceived predicament; the complexity of the case; other available assistance; the probable utility of a continuance; inconvenience to others; and the likelihood of injustice if there is no continuance.  See id.  "Requests for continuances of sentencing are disfavored given the district

court's obligation to 'impose sentence without unnecessary delay.'" United States v. Espinola, 242 F. App'x 709, 711 (1st Cir. 2007) (quoting Fed. R. Crim. P. 32(b)(1)), judgment vacated on other grounds by Espinola v. United States, 552 U.S. 1240 (2008).

The district court did not abuse its discretion in denying Rosario-Otero's request for a continuance. Rosario-Otero's contemporaneous justification for a continuance was that he needed to bring in Juan Rivera-Gómez as a witness, but it appears that the real issue was his failure to meet with his counsel until the night before the resentencing hearing. This was not a compelling reason to grant his belated request. Indeed, the circumstances that prevented Rosario-Otero from meeting with his counsel until the eleventh hour would have been apparent long before the day of the hearing. In particular, Rosario-Otero had plenty of time to inform the court that his transfer to Puerto Rico was delayed by about one month. If he anticipated that this delay could hamper his ability to present evidence at resentencing, he should not have waited until the day of the hearing to make an oral request for a continuance.

Rosario-Otero argues that the government is partially to blame for his inability to gather the appropriate witnesses because it did not inform him of the evidence it would present at resentencing. This claim, which the government disputed at the hearing and again in its appellate brief, is belied by the record.

At sentencing, Rosario-Otero's counsel said that he was unaware of the evidence that the government would present that day. When asserting the need for Rivera-Gómez's testimony, however, he acknowledged that "we received evidence from William Rosario explaining to us [the evidence relating to "Apartment 50"]. [And] Juan Rivera-Gómez, he was the owner of that apartment." Rosario-Otero was attuned to what the government would try to prove at resentencing, and there is nothing to suggest that the government prejudiced his ability to prepare for the hearing.

Moreover, Rosario-Otero has not shown the probable utility of a continuance or any injustice resulting from its denial. Rosario-Otero admitted that he had not spoken with Rivera-Gómez prior to the resentencing -- or that he even knew where Rivera-Gómez was located -- so it cannot be said with any confidence that Rivera-Gómez's hypothetical testimony, if forthcoming, would have changed the result of Rosario-Otero's resentencing.[1]

---

[1] Rosario-Otero made a second request for a continuance at the close of William's testimony, claiming that he needed to call Agent Rodriguez to impeach William. The same deficiencies that sink his first request for a continuance apply with equal force to this one. In addition, as we explain later, there was no meaningful inconsistency between William's trial testimony and his sentencing testimony -- further evidence that the district court did not abuse its discretion in denying this second request for a continuance.

B.        Drug Quantity Determination

        We review a district court's factual findings at sentencing, including drug quantity, for clear error, United States v. Cintrón-Echautegui, 604 F.3d 1, 5 (1st Cir. 2010), which arises only when "we form a strong, unyielding belief that a mistake has been made." United States v. Marquez, 280 F.3d 19, 26 (1st Cir. 2002) (quoting Cumpiano v. Banco Santander, 902 F.2d 148, 152 (1st Cir. 1990)). "The sentencing court must determine drug quantity only by a preponderance of the evidence." Cintrón-Echautegui, 604 F.3d at 6.

        The district court did not commit clear error in arriving at its drug calculation. Although there was testimony that the Los Dementes organization distributed a kilogram of cocaine each week for several years, the district court limited its drug finding to a total of between 5 and 15 kilograms of cocaine. The government produced sufficient evidence for the district court to conclude that such amount was reasonably foreseeable to Rosario-Otero.

        William testified that Rosario-Otero was at Apartment 50 several times each week, often to pick up packaged drugs. Apartment 50 was the center of activity for Los Dementes, and Rosario-Otero's repeated presence there indicates his awareness of the scope of the trafficking organization. In addition, William provided testimony that Rosario-Otero ran a drug point for Los Dementes. Whereas we previously found William's trial testimony

-10-

regarding Rosario-Otero's drug point lacking in detail or corroboration, Fernández-Hernández, 652 F.3d at 70, at the resentencing hearing William gave concrete explanations for how he knew this fact. He explained not only that sellers at the drug point identified Rosario-Otero as the owner, but also that Rosario-Otero gave William drug vials matching those sold at the drug point. William also recounted several occasions when Rosario-Otero personally gave him small amounts of cocaine to process into crack and to test its potency. Based on this fact, the sentencing court could determine that Rosario-Otero's involvement went beyond merely picking up drugs to sell and extended to processing the drugs. Taken in the aggregate, this evidence supports the sentencing court's finding as to foreseeability.

Rosario-Otero's main argument on appeal is that William's testimony changed between trial and resentencing. We disagree with this characterization. While William's resentencing testimony was more detailed than his trial testimony, it was not inconsistent. Moreover, the court was not required to reject William's explanation that he remembered new facts that he had failed to mention at trial. Rosario-Otero had the opportunity to cross-examine William, and could have used the trial transcript to impeach his testimony if there were any material inconsistencies.

Rosario-Otero nevertheless claims that, even if the testimony was not inconsistent, William's improved memory at

resentencing raises credibility issues that the district court should have factored into its analysis. But the district court was not oblivious to the question of William's credibility; it simply reached a conclusion contrary to Rosario-Otero's. Such credibility determinations are left to the sentencing court. See United States v. Platte, 577 F.3d 387, 392-93 (1st Cir. 2009) ("In conducting [a drug quantity calculation,] credibility determinations are part of the sentencing court's basic armamentarium."). There was no clear error in the sentencing court's drug quantity calculation.

C.      Term of Supervised Release

Based on its drug quantity finding, the district court imposed a sentence of 151 months' incarceration and a 10 year term of supervised release. While the district court committed no reversible error in calculating Rosario-Otero's prison sentence, there was an unnoticed error in its calculation of the term of supervised release, which we now vacate. The applicable statutory section, 21 U.S.C. § 841, establishes different sentencing ranges based on the drug quantity involved in the crime. In the case of cocaine, possession without a finding as to quantity calls for "a term of supervised release of at least 3 years" or, if there was a prior conviction, "at least 6 years." 21 U.S.C. § 841(b)(1)(C). A drug quantity finding of 5 kilograms or more of cocaine (as the sentencing court found) requires a mandatory minimum term of

supervised release of 5 years, or 10 years with a prior conviction. Id. § 841(b)(1)(A).

For reasons that are unclear to us, the Pre-sentence Investigation Report (PSI Report) stated that Rosario-Otero faced a mandatory minimum term of supervised release of 10 years given a finding of at least 5 kilograms of cocaine.[2] The district court adopted this recommendation without any explanation. The mandatory minimum term of supervised release should have been 5 years, since Rosario-Otero had no prior convictions on his record according to the PSI Report. Even if he had a prior conviction, the government would have been required to give notice that it would rely on that prior conviction to increase his sentence. See 21 U.S.C. § 851; Suveges v. United States, 7 F.3d 6, 10 (1st Cir. 1993) ("The filing of . . . an information notice [under 21 U.S.C. § 851] is jurisdictional."). The probation officer seems to have committed a simple error in calculating the mandatory minimum, and the district court relied on that incorrect calculation in imposing a term of supervised release.

---

[2] The PSI Report, which was prepared for the original sentencing, relied on the jury's finding of elevated drug quantities, which we vacated in United States v. Fernández-Hernández, 652 F.3d 56 (1st Cir. 2011). There was no new PSI Report prepared for resentencing. The sentencing court, however, made the identical factual finding as to drug quantity and imposed the identical sentence, so we consider the original PSI Report to understand the sentencing court's rationale.

Though Rosario-Otero did not raise this issue below or on appeal, we consider this error both plain enough and weighty enough to merit our review <u>sua sponte</u>. The four-pronged test for plain error review requires that the (1) "error" is (2) "plain" and (3) "affects substantial rights," and that the error (4) "seriously affects the fairness, integrity or public reputation of judicial proceedings." <u>United States</u> v. <u>Olano</u>, 507 U.S. 725, 732 (1993) (citations omitted) (internal quotation marks and alterations omitted). The fourth prong incorporates a standard that a court may use to evaluate whether to raise an issue <u>sua sponte</u>. <u>See</u> <u>United States</u> v. <u>Atkinson</u>, 297 U.S. 157, 160 (1936). This easily avoidable error doubled the minimum term of Rosario-Otero's supervised release. Having discovered the error, failure to correct it would reflect poorly on our ability to dispense justice, even if it has not been briefed by either side. <u>See</u> <u>United States</u> v. <u>Matos</u>, 611 F.3d 31, 37 (1st Cir. 2010) (vacating a sentence where the term of supervised release exceeded the statutory maximum); <u>United States</u> v. <u>Rodriguez</u>, 489 F. App'x 528, 531 (3d Cir. 2012) (vacating a sentence where the PSI Report erroneously doubled the mandatory minimum term of supervised release); <u>see also</u> <u>United States</u> v. <u>Barnes</u>, 251 F.3d 251, 261 n.5 (1st Cir. 2001) (holding that error in calculating a term of supervised release constitutes plain error). Accordingly, we vacate the term of

-14-

supervised release and remand the case to the district court to recalculate that element of Rosario-Otero's sentence.[3]

## III.

For the foregoing reasons, we **<u>affirm</u>** the sentence as to its term of incarceration; we **<u>vacate</u>** the sentence as to the term of supervised release and **<u>remand</u>** the case for further action consistent with this opinion.

---

[3] In recalculating the term of supervised release, the district court must take heed of the Supreme Court's recent decision in <u>Alleyne</u> v. <u>United States</u>, 133 S. Ct. 2151 (2013), which held that "any fact that increases the mandatory minimum is an 'element' that must be submitted to the jury," <u>id.</u> at 2155. Thus, if the district court seeks to impose a mandatory minimum term of supervised release, it must rely only on the facts found by the jury. The Supreme Court noted, however, that the holding in <u>Alleyne</u> "does not mean that any fact that influences judicial discretion must be found by a jury. We have long recognized that broad sentencing discretion, informed by judicial factfinding, does not violate the Sixth Amendment." <u>Id.</u> at 2163. "While such findings of fact may lead judges to select sentences that are more severe than the ones they would have selected without those facts, the Sixth Amendment does not govern that element of sentencing." <u>Id.</u> at 2161 n.2.